**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| REINARD SMITH, | |
| *Plaintiff,* | CIVIL ACTION |
| v. | NO. 16-00654 |
| EFFLUENT RETRIEVAL SERVICES, INC., and JOHN BEAGLE. | |
| *Defendants.* | |

**PAPPERT, J.**                                                    **October 21, 2016**

## MEMORANDUM

From time to time Reinard Smith worked for Effluent Retrieval Services wiping down cars at auto auctions.  He chose the days on which he wanted to work and ended up logging a total of twelve to fourteen shifts (some of which were as short as three and a half or four hours) over the course of two months in late 2015.  Believing he was owed $154 for services rendered, Smith sued Effluent and its owner John Beagle (collectively "Defendants") alleging retaliation under the Fair Labor Standards Act, discrimination under Title VII and claiming emotional distress, presumably under Pennsylvania common law.[1]  Smith is *pro se*.[2]

---

[1]     Smith withdrew his emotional distress claim in his Response in Opposition to Defendants' Motion for Summary Judgment.  (Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Resp."), at 11.)

[2]     At the Rule 16 Conference, the Court informed Smith of the Eastern District of Pennsylvania's *pro se* employment law panel, (Tr. Rule 16 Conference, at 34:10–19, ECF No. 38), and repeatedly offered to refer Smith's case to an attorney, (*id.* at 38:14–20, 41:16–18).  Smith, however, did not want the Court to do so.  (*Id.* at 41:19–42:3.)

## I.

The record in this case is relatively sparse, as Smith has conducted very little discovery.[3] Nevertheless, the following facts are undisputed.  Smith occasionally worked for Effluent over the course of two months in 2015.  (Defs.' Mot. for Summ. J., Stmt. of Undisputed Material Facts ("Defs.' Stmt."), ¶ 2, ECF No. 33; Defs.' Mot. for Summ. J., Ex. B, at 1–24, ECF No. 33-2.)  Smith's duties consisted of wiping down cars at auto auctions.  (Defs.' Stmt., ¶ 2; Pl.'s Stmt. Undisputed Material Facts ("Pl.'s Stmt."), ¶ 30.)  On the days Smith worked, he arrived at an Effluent facility and, along with other workers, was transported to the jobsite for the day.  (Pl.'s Stmt. ¶¶ 2, 14, 15, 23).  An Effluent employee supervised Smith and the others as they worked. (Smith Dep. 45:7, 55:15–20, 76:19.)

The particular work Smith performed for the company was only available on Mondays, Tuesdays and Wednesdays.  (*Id.* at 22:19–22.)   Smith did not, however, consistently work on those days.  Rather, he chose to work—or not work—for Effluent as he pleased.  *See* (*id.* at 32:19–22).  He worked a total of twelve or fourteen shifts for Effluent, some as short as three and a half hours, (Defs.' Mot. for Summ. J., at 162, ECF No. 33-1), over the span of two months, s*ee* (Defs.' Stmt. ¶ 27).  Smith faced no repercussions when he chose not to show up, *see* (Smith Dep. at 50:23–51:12; Defs.' Stmt., ¶¶ 18–22), and had no guarantee of being selected to work even when he did come to Effluent's building.  (Pl.'s Stmt., ¶ 2.)

This case has its origins in a dispute over two days' pay.  Smith's name was not on an Effluent sign-in sheet for September 29, 2015, though he contends he worked that day.  (Smith Dep. 18:22–24.)  Smith did not sign in because he was not told that someone needed to take his

---

[3]        For one, Smith cancelled his scheduled deposition of John Beagle.  (Defs.' Reply Mem. on Summ. J., at 25, Ex. C.)  While the record itself is sparse, the parties have briefed the issues extensively.  In response to Defendants' Motion for Summary Judgment (ECF No. 33), Smith filed a Response in Opposition (ECF No. 34) and, with the Court's leave, a Sur-Reply (ECF No. 39) in response to Defendants' Reply (ECF No. 25).

name down before starting work that day.  (2nd Am. Compl. ¶ 10.)  Because his name did not appear on the sheet, Effluent did not pay Smith.  (*Id*. ¶¶ 14, 16; Defs.' Answer ¶¶ 14, 16.)  Smith unsuccessfully attempted to speak with John Beagle to rectify this problem.  (2nd Am. Compl. ¶ 14; Defs.' Answer ¶ 14.).  Smith also contends that Effluent failed to pay him for his work on November 9, 2015, even though his name was on that day's sign-in sheet.  (Defs.' Stmt. ¶ 27.)

Smith sent a complaint letter to Beagle detailing these issues on November 27, 2015. (2nd Am. Compl., Ex. A, at 2, ECF No. 7-1.)  In that letter, Smith noted that he was not paid for September 29, 2015 or November 9, 2015, and when he brought the problem to an Effluent supervisor, the supervisor "cut [his] hours of work."  (*Id.*)  He also noted that he was "made to feel scrutinized and constantly[ ] under threat that [he would] be fired" if he sought compensation for those days.  (*Id.* at 3.)  Beagle and Smith spoke by telephone on November 27, 2015, though the parties dispute the content of the conversation.  (2nd Am. Compl. ¶ 32–33; Defs.' Answer ¶ 32–33.)  Smith alleges that as a result of pursuing his compensation, he experienced harassment and ultimately termination by a supervising Effluent employee in retaliation.  (2nd Am. Compl. ¶ 23, 33.)

Smith filed this lawsuit on February 16, 2016.  (ECF No. 3).  He alleges retaliation under the Fair Labor Standards Act ("FLSA"), stemming from his alleged mistreatment and termination at the hands of Effluent employees following his complaint regarding unpaid wages. (2nd Am. Compl. ¶¶ 39, 41.)  Smith also alleges discrimination under Title VII of the Civil Rights Act of 1964 based on comments made by John Beagle and another Effluent employee. (*Id.* ¶¶ 47–48.)  Smith seeks compensatory and punitive damages, (*id.* ¶¶ 48–50), and contends that because of Defendants, his "family has fallen apart" and he is "financially unable to afford private room and board," (*id.* ¶ 34).

Not long after filing suit, but apparently before the Defendants were served with the Complaint, Smith sent another letter to Beagle on March 2, 2016. (2nd Am. Compl., Ex. D, ("Demand Letter") at 25, ECF No. 7-1.) In that letter, Smith's initial complaint over $154 in unpaid wages, *see* (Smith Dep. 67:11–13), morphed into alleged damages ranging "anywhere from $75,000 to $300,000." (Demand Letter, at 26.) Smith arrived at this number by including "back as well as front pay along with a discrimination claim . . . [and a] claim of mental distress," and asserted that "courts allow . . . punitive damages which can be granted to a plaintiff in [a] ratio of 9 to 1." (*Id.*) Smith also told Beagle that if Effluent refused to settle, the company's "financial records will be up for inspection," and that "[t]his means if you haven't been complying with tax laws you will be facing more than my civil suit in court," potentially causing Beagle "irreparable harm." (*Id.* at 26.)

Defendants now move for summary judgment, contending that Smith was not an employee for the purposes of either the FLSA or Title VII. In Smith's Response in Opposition to Summary Judgment (ECF No. 34), he seeks leave to amend his complaint to add another retaliation claim under Title VII. After thoroughly reviewing the record and the parties' submissions, the Court denies Smith's request for leave to amend, grants the motion and enters judgment in the Defendants' favor.

## II.

Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." *Smathers v. Multi–Tool, Inc./Multi–Plastics, Inc. Emp. Health & Welfare Plan*, 298 F.3d 191, 194 (3d Cir. 2002); *see also* Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when "a reasonable jury could return a verdict for the nonmoving party."

4

*Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  A mere scintilla of evidence in support of the non-moving party will not suffice; there must be evidence by which a jury could reasonably find for the non-moving party.  *Id.* at 252.

In reviewing the record, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor."  *Prowel v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir. 2009).  The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment.  *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).  The Court is obligated to construe *pro se* submissions liberally.  *Dluhos v. Strasberg*, 321 F.3d 365, 369 (3d Cir. 2003).  This obligation does not, however, immunize a *pro se* plaintiff from summary judgment when their claims "lack procedural or factual viability."  *Metsopulos v. Runyon*, 918 F. Supp. 851, 857 (D.N.J. 1996).

### III.

### A.

Smith first accuses Effluent of retaliating against him by harassing and terminating him after he complained about his alleged unpaid wages.  The FLSA's antiretaliation provision makes it illegal "to discharge . . . [an] employee [who] has filed any complaint or instituted . . . any proceeding under or related to this chapter."  29 U.S.C. § 215(a)(3).   The statute defines an "employee" as "any individual employed by an employer," *id.* § 203(e)(1), and further explains that "'[e]mploy' includes to suffer or permit to work,"  *id.* § 203(g).  In light of these expansive statutory definitions, "[t]here is no single test to determine whether a person is an employee or an independent contractor for purposes of the FLSA."  *Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1293 (3d Cir. 1991).

To determine whether a plaintiff is an employee for purposes of the FLSA, the Court must consider the "circumstances of the whole activity." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947). In this Circuit, "there are six factors to determine whether a worker is an 'employee,'" though "neither the presence nor the absence of any particular factor is dispositive." *Martin*, 949 F.2d at 1293. The Court must consider: (1) the degree of the putative employer's control over the worker; (2) the alleged employee's opportunity for profit or loss; (3) the alleged employee's investment in equipment or materials; (4) whether the work requires any special skills; (5) the degree of permanence of the relationship between the alleged employee and employer; and (6) whether the service rendered is "an integral part" of the putative employer's business. *Id.* at 1293. The Court must also determine "whether, as a matter of economic reality" Smith was economically dependent on Effluent. *Donovan v. DialAmerica Mktg., Inc.*, 757 F.2d 1376, 1382 (3d Cir. 1985).

Effluent did not exercise substantial control over Smith's work. Effluent kept an employee present to supervise the job sites where Smith worked, (Smith Dep. 45:7, 55:15–20, 76:19), and required workers to arrive at Effluent's headquarters by a certain time on the Mondays, Tuesdays or Wednesdays that work with the company was available, (*id.* at 22:19–22). Effluent then drove workers to and from their jobsite for the day. (*Id.* at 59:8–14.) While the company therefore had some degree of control over Smith, its overall control over Smith's work was minimal. Effluent did not, for example, evaluate Smith or other laborers' performance, nor did it kept any record of Smith's productivity. (Defs.' Mem. in Opp'n to Pl.'s Mot. to Compel Better Answers to Interrogs., Ex. A, at 14, ECF No. 26.)

Smith worked (or did not work) whenever he wanted and Effluent did not in any way set his schedule. When Smith missed a day of work, as he often did, there were no repercussions; he

was effectively free to come and go as he pleased.  *See* (Smith Dep. at 50:23–51:12; Defs.' Stmt.,

¶¶ 18–22); *see also Adami v. Cardo Windows, Inc.*, No. 12-2804, 2016 WL 1241798, at *8

(D.N.J. Mar. 30, 2016) (finding employer had little control over plaintiffs because plaintiffs

"took breaks from working for [the defendant] and returned as they pleased").  This was the case

regardless of Smith's reason for missing work.  For example, Smith testified that he missed work

on November 10, 2015 because "[s]ometimes it's hard to get up and make it there by six o'clock

in the morning."  (Smith Dep. 32:19–22).  After missing work, Smith was not reprimanded or

penalized in any way—no one from Effluent even mentioned his absence.  (*Id.* at 34:8–18.)

Considering the unlimited control Smith retained over when (indeed, if) he worked for Effluent,

and the limited facts on the record to show any serious supervision over Smith, this factor

suggests Smith was not an Effluent employee.

Smith had neither the opportunity for profit nor risk of loss while he worked for Effluent

and his performance could not affect his potential earnings.  Rather, he earned a flat wage of $11

per hour.  (*Id.* at 66:14–16.)  Moreover, Smith made no investment in equipment to perform his

tasks for Effluent.  Wiping down cars before auto auctions required minimal equipment.  *Cf.*

*Cherichetti v. PJ Endicott Co.*, 906 F. Supp. 2d 312, 317 (D. Del. 2012) ("[I]t is appropriate to

compare the worker's individual investment to the employer's investment in the overall

operation.").  Both factors weigh in favor of finding that Effluent employed Smith.

The nature of Smith's work similarly favors finding him an employee.  "Unskilled

workers are more likely to be deemed employees because routine work which requires industry

and efficiency is not indicative of independence and nonemployee status."  *Id.* (quoting *Martin*,

949 F.2d at 1295).  Smith's work consisted of wiping down cars for auto auctions, (Smith Dep.

at 22:8–9), an activity not demanding any special skill.

The degree of permanence of the relationship between Smith and Effluent militates in favor of concluding that Smith was not an employee of the company.  In short, nothing was permanent about Smith's working relationship with Effluent.  In evaluating permanence, the Court "should consider the exclusivity, length and continuity of the relationship," and keep in mind that the duration of the relationship is less significant than the hours worked and the exclusivity of the working arrangement.  *Cherichetti*, 906 F. Supp. 2d. at 318.   The relationship between Smith and Effluent was nonexclusive: Smith could have worked a maximum of three days per week, (Smith Dep. 22:19–22), and was free to work for another employer when not working for Effluent.  Smith also worked minimal hours for Effluent: he worked a total of twelve or fourteen shifts over the entire course of his relationship with Effluent, (Defs.' Stmt. ¶ 27), with a number of those shifts less than eight hours, and some as short as three and a half hours, (Smith Dep. 41:18–20; 67:5–9; Defs.' Mot. for Summ. J., at 141–62, ECF No. 33-1).  While less important, the overall length of the working relationship was also limited—Smith's sporadic work for Effluent occurred over a period of approximately two months.  *See* (Defs.' Stmt., ¶ 27; Defs.' Mot. for Summ. J., Ex. B, at 1–24, ECF No. 33-2).  This relatively brief stint cannot be said to "have the length of a typical employment relationship."  *See Zanes v. Flagship Resort Dev., LLC*, No. 09-3736, 2012 WL 589556, at *6 (D.N.J. Feb. 22, 2012) (finding two plaintiffs who worked for defendant company, one from "September 2008 through December 2008" and another from "August 2008 to November 2008," lacked the length of a typical employment relationship).

Smith downplays this lack of permanence by relying on *Verma v. 3001 Castor, Inc.*, No. 13-3034, 2014 WL 2957453 (E.D. Pa. June 30, 2014), for the proposition that the lone fact that a worker is itinerant is insufficient to remove him from FLSA protection.  To that extent, Smith is

correct.  Smith overlooks, however, the substantial differences between *Verma* and his own situation.  In *Verma*, exotic dancers working at the Penthouse Club were found to be employees despite being classified by the club as independent contractors.  Penthouse Club thoroughly structured the dancers' work: customers paid the dancers based on a fee schedule established by the club; the club dictated dancers' hygiene standards, "choice of dress and hairstyle"; dancers were required to work at least four days per week and two weekend days per month; and were required to provide their preferred schedule to a manager each week.  *Id.* at *1–2.  Dancers also faced various fines if they failed to comply with the club's policies.  They were fined if they were late for a shift, if they were not present on the club's premises for the entirety of their shift, left the stage too early, failed to appear for a scheduled performance, chewed gum while performing, used a cell phone while "on stage or on the floor," or smoked while on the club's premises.  *Id.* at *2–3.

To determine whether the dancers were contractors or employees, the *Verma* court applied the same six factors applied here.  *Id.* at *4 (citing *Donovan v. DialAmerica Mktg., Inc.*, 757 F.2d 1376, 1382–83 (3d Cir. 1985)).  In doing so, it found that the defendant controlled the dancers opportunities for profit and loss, *id.* at *8 ("Dancers cannot leverage their investment in recurring stage frees and tip-outs to create an increasing return on their investment."), had limited relative investments in equipment or supplies compared to the club, *id.*, and did not possess any specialized skill—all favoring employee status, *id.* at *9.

The court then found "a lack of permanence in the dancers' relationship with [the club]," as dancers were permitted to perform elsewhere and often did not have long-term relationships with one particular club.  *Id.*  In analyzing the employment relationship as a whole, the court in *Verma* thoroughly detailed the degree of control the club exercised over the dancers, *id.* at *5–7

9

(noting that the club kept the dancers "under nearly continuous review"), and found that the control factor "weigh[ed] overwhelmingly in favor of a finding that the dancers were employees, not independent contractors," *id.* at *7.  Such control is utterly absent in this case.

Given the record, Smith's work appears to be an integral part of Effluent's business. "[Effluent] is a business that provides services that include wiping down cars at auto auctions." (Defs.' Stmt., ¶ 1.)  Smith's work consisted solely of doing just that.  (Smith Dep. at 22:8–9.)

Finally, the Court must consider "whether, as a matter of economic reality" Smith was economically dependent on Effluent.  *Donovan*, 757 F.2d at 1382.  This evaluation does not ask whether the putative employee used the money he earns for obtaining necessities.  *Id.* at 1385. Rather, it examines whether the worker was dependent on the business for his continued employment.  *Id.*  On the record in this case, Smith was not economically dependent on Effluent. While Smith could have worked as many as three days per week throughout his relatively brief relationship with Effluent, he worked a total of only twelve or fourteen shifts for the company. Nothing about Smith's relationship with Effluent limited him to working there and he was free to pursue employment with other parties on any of the days he chose not to work for Effluent. Effluent also did not guarantee work for Smith on the days he showed up, (Pl.'s Stmt., ¶ 2), suggesting a lack of dependence.  Smith's freedom to work elsewhere and his limited actual work for Effluent demonstrates Smith was not economically dependent on Effluent.  *See Krause v. Cherry Hill Fire Dist. 13*, 969 F. Supp. 270, 275 (D.N.J. 1997) ("In a sense, [the economic dependence] inquiry is related to the question of 'permanency' in the relationship between the worker and the putative employer.  A worker who has an 'impermanent' relationship, is also likely to be a worker with numerous options for employment in the particular field at issue, and therefore, not economically dependent on a single employer.").  Smith asserts, however, that he

is now homeless due to Effluent's retaliation.  (2nd Am. Compl. ¶ 34.)  This overlooks the fact that Smith was free to work elsewhere during his brief time with Effluent and that during that time, Smith regularly chose not to work for the company.  *See, e.g.*, (Smith Dep. 32:19–22).

Considering the economic realities of the situation as a whole, Smith was not an Effluent employee.  The factors listed above are not a checklist, but rather a guide for a holistic review.  *See Rutherford*, 331 U.S. at 730.  While some of the factors suggest an employer-employee relationship, the nature of the relationship as a whole does not.  The relationship was sporadic and devoid of any substantial control and Smith was not economically dependent on the company.[4]

## B.

In Smith's second count, he alleges Effluent discriminated against him based on his race in violation of Title VII.  The gist of Smith's racial discrimination claim is that an Effluent supervising employee named Manny allegedly used the term "black" with a "racial overtone" and that Smith was the only person Manny would "pick with" while Smith tried to eat and work at the same time.  (2nd Am. Compl. ¶¶ 23, 24.)  Aside from these and other similarly conclusory allegations, there is no evidence in the record to support a racial discrimination claim.  In any event, Smith is not an "employee" for purposes of Title VII.  The FLSA defines "employee" far more broadly than does Title VII.  *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) (examining 29 U.S.C. § 203(g)).  Indeed, the FLSA's inclusion of the "suffer or permit to work" standard makes it the "the broadest definition of 'employ' that has ever been in any one

---

[4]     In his Response in Opposition to Defendant's Motion for Summary Judgment, Smith also moves for summary judgment on the issue of his employment status. (Pl.'s Resp., at 10.)  In support, Smith notes only that Jonathan Beagle called him on November 27, 2015 and contends that the only way Beagle could have obtained Smith's phone number was through the complaint letter Smith gave to Beagle earlier that day.  (*Id.* at 8.)  From these premises, Smith concludes that no reasonable jury could find that he was not an employee of Effluent.  Even taking everything in the light most favorable to Smith, this argument is entirely meritless.

act." *Zheng v. Liberty Apparel Co, Inc.*, 355 F.3d 61, 69 (2d Cir. 2003) (quoting *United States v. Rosenwasser*, 323 U.S. 360, 363 n.3 (1945)). By contrast, Title VII defines employee under the comparatively narrower common-law test. *Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 214 (3d Cir. 2015) (citing *Darden*, 503 U.S. at 323). The *Darden* test includes the following twelve, non-exhaustive factors:

> [T]he skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Darden*, 503 U.S. at 323–24.

Inasmuch as Smith was not Effluent's employee for the purposes of the FLSA, he was certainly not an employee of the company for the purposes of the narrower Title VII test. *See Yue Yu v. McGrath*, 597 F. App'x 62, 66 (3d Cir. 2014) (finding that "if [a business] was not [a plaintiff's] employer under the FLSA's more expansive definition, it follows that [the business] was not [plaintiff's] employer under the narrower common law definition used for Title VII cases.").

## C.

Smith also seeks leave to amend his complaint to add a claim for retaliation under Title VII. A motion to amend the complaint typically will be freely given when the interests of justice so require. Fed. R. Civ. P. 15(a). The Court has the discretion to deny a request to amend, however, if (1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party. *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 116 (3d Cir. 2003). Moreover, where a party moves to

amend after a motion for summary judgment is filed, "the courts in this Circuit have imposed stringent standards before granting such motions." *Ali v. Intertek Testing Servs. Caleb Brett*, 332 F. Supp. 2d 827, (D.V.I. 2004) (citing *Carey v. Beans*, 500 F. Supp. 580, 582 (E.D. Pa. 1980)). Such a motion will not be granted unless the party seeking amendment can show that the proposed amendment has substantial merit and is supported by substantial and convincing evidence supporting the newly asserted claim. *Id.*

Smith's request to amend his complaint includes neither a showing of substantial merit nor any substantial or convincing evidence to support his proposed claim. In any event, because Smith is not an employee for the purposes of the FLSA or Title VII, his proposed amendment would be futile.

An appropriate order follows.

BY THE COURT:


*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.